```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

UNITED STATES OF AMERICA,      Crim. No. 16-397(NLH)

        v.                              OPINION

TERRELLE NELSON,

        Defendant.

**APPEARANCES:**

Jacqueline Carle, Esquire
Office of the United States Attorney
401 Market Street
4th Floor
Camden, New Jersey 08101
    *Attorney for Plaintiff the United States of America*

A. Harold Kokes, Esquire
728 West Avenue
Suites S201-202
Ocean City, New Jersey 08226
    *Attorney for Defendant Terrelle Nelson*

**HILLMAN, District Judge**

    This matter comes before the Court by way of a motion [Doc. No. 25] by Defendant Terrelle Nelson ("Defendant" or "Nelson") seeking to suppress statements allegedly made by the Defendant to a United States Postal Inspector ("Inspector or Inspectors"), and other law enforcement officials, on May 10, 2016.  Defendant also seeks to suppress any evidence obtained as a result of the statements in question.  The United States of America

(hereinafter, "the Government") opposes Defendant's motion and filed a cross-motion seeking reciprocal discovery.  The Court considered the parties' submissions and held a hearing on the motions on December 9, 2016.  At that time, the Court directed the parties to submit supplemental briefing.  The Court has now had the opportunity to review the supplemental submissions, and the motions are ripe for review.

For the reasons expressed below, Defendant's motion to suppress will be denied, and the Government's cross-motion for reciprocal discovery will be granted.

I.   BACKGROUND

On June 16, 2016, Inspectors intercepted a suspicious Priority Mail package.  The package was addressed to "Terry Rollins, 103 Blanche St., Browns Mills, NJ 08015" and had a return address of "Marco Joffroy, 11745 N. 125th St., Scottsdale, AZ 85259" and had been mailed from Scottsdale, Arizona on June 14, 2016.

After determining that no one named "Joffroy" was associated with the return address, a drug detection canine was exposed to the package and indicated the presence of illegal narcotics.  Thereafter, a warrant was obtained and the package

2

opened.  Inside was a gift wrapped inner box.  Inside this second box was a heavily wrapped bundle of crystalline methamphetamine weighing approximately 2.2 pounds.

On June 17, 2016, the Inspectors obtained an anticipatory federal search warrant for the Blanche Street location and a Tracking Warrant to allow them to monitor the contents of the Subject Parcel.  The Inspectors repackaged the parcel with a sham bundle, a portion of which included approximately 5.5 ounces of the original bundle of methamphetamine.

The same day, June 17, 2016, the Inspectors conducted a controlled delivery of the package to Blanche Street.  An inspector, posing as a Postal letter carrier, attempted to deliver the package to the address.  A male individual, later identified as the adult son of the Defendant's wife, accepted and signed for the package at approximately 2:10 p.m. and took it into the residence.

At approximately 4:25 pm, law enforcement officers witnessed the Defendant and his wife arrive by car and enter the Blanche Street address.  About four hours later, officers and Inspectors executed the anticipatory search warrant at the Blanche Street address.[1]  One portion of the warrant team entered

---

[1] It is unclear from the testimony at the hearing whether the

the front of the residence, while other members of the law enforcement team surrounded the perimeter of the residence by approaching the back yard. The perimeter team found the Defendant and his wife in the back yard of the residence. No one else was found on the property or in the house. Nelson was standing in front of an open shed when he surrendered to law enforcement. His wife was closer to the residence. Law enforcement cleared the residence for officer safety, separated the Defendant and his wife in different locations, and executed a full search of the residence and property.

Defendant was handcuffed and placed the backseat of the police car, where he remained for several hours, while the law enforcement team, which included federal, county, and local officers, searched and secured the property.[2] During the search, law enforcement seized a number of items from the residence including: (1) approximately $44,855 in United States currency;[3]

---

tracking device indicated the package had been opened or whether law enforcement became convinced after approximately six hours that the package had found its intended destination.

[2] All the evidence in the record suggests that the Defendant, although handcuffed, was comfortable in the back seat and his basic needs met. There is no allegation that he was under any real or perceived physical threat or otherwise physically coerced, and no evidence to suggest that he was.

[3] The $44,855 includes both the money found in the residence and

4

(2) a Royal Sovereign money counter; (3) a variety of pills; (4) a heat sealer; (5) a vacuum sealer; (6) a hand-held digital scale; and (7) four cellular telephones.  Law enforcement also seized a number of items from the inside the shed on the property, and immediately around the shed on the property.  Those items included: (1) approximately one pound of a brown powdery substance that field tested positive for heroin; and (2) a vacuum sealed bag containing: (a) approximately 10 ounces of a green leafy substance which field tested positive for marijuana; (b) approximately 1.4 grams of a white powdery substance that field tested positive for cocaine; and (c) approximately 9.7 grams of crystalline methamphetamine recovered from the open shed in the back yard of the Blanche Street address where the Defendant was standing when he surrendered to law enforcement.

Additionally, in the rear portion of this same shed, lightly covered with a pile of leaves, was the inner box from the delivered package that had been intercepted by the Inspectors.  Inside was the representative sample of methamphetamine the Inspectors had substituted for the larger amount of drugs.  A few feet from the inner box, also under the

---

on the person of the defendant.  Another $40,160 in currency was seized from a safe deposit box at a Browns Mills bank.

shed and lightly covered with leaves, was a bag containing a loaded .38 special Smith and Wesson revolver.  On the Defendant's person, law enforcement recovered approximately 154 Percocet pills, a cellular telephone, and some of the United States currency described above.

Law enforcement read Nelson his Miranda rights at approximately 9:23 p.m. while Nelson sat inside a law enforcement vehicle parked in front of the Blanche Street residence.  Nelson waived his Miranda rights and executed a U.S. Postal Inspection Service Warning and Waiver of Rights form that sets forth each of Nelson's rights.  Law enforcement initially asked only identifying questions of Nelson.

At 10:51 p.m., Inspector Zavorski re-read Nelson his Miranda rights.  Again, Nelson indicated that he understood his rights and was willing to speak to law enforcement.  In sum and substance, Nelson initially stated that he was not aware of any package being delivered to his residence.  In fact, Nelson suggested to Inspector Zavorski that wife's son was receiving packages at the residence.  The agent asked Nelson how much money was in the residence, and Nelson responded that about $30,000 was located in the bedroom hamper and on the floor. Nelson further admitted that the $30,000 was obtained from sales

6

of "dope" and confirmed that "dope" is heroin that Nelson sells out of his residence or the shed in the back yard of his residence. Nelson stated that he was at Lowes when his wife's son, called him to inform him that his (Nelson's) package had arrived from the post office. According to Nelson, he told his wife's son to "put it up for him." Nelson explained that meant to hide the package in the backyard by the shed until Nelson came home.

Nelson said he was expecting a package containing 2 pounds of crystal methamphetamine which he paid $8,000 for from a male individual in California. According to Nelson, his wife's son did not follow the instructions and left the package in the house. Nelson said he took the package outside, but would not say where he placed it. Nelson said he (Nelson) did not fully open the package because he was not ready to sell the methamphetamine. Nelson admitted that his plan was to sell the methamphetamine to a Mexican man he knew as "Juan" for $13,000.

Law enforcement asked Nelson if he had any money or knowledge of any more money from the sale of illegal drugs stored in any other locations. Nelson admitted that he had a safe deposit box at a bank in Browns Mills and stated that his wife had the key. Nelson stated, however, that he did not know

7

how much money was in the safe deposit box.

    Law enforcement also interviewed Nelson's wife after reading her Miranda rights at approximately 11:00 p.m. on June 17, 2016. She stated that she was with Nelson at Lowes when her son called to tell them that Nelson's package had arrived. She said she knew the package contained illegal narcotics, but she was not interested in the exact type. When she and Nelson arrived at the Blanche Street address, she stated that Nelson opened the package in the living room, but she did not see what he did with the contents. She stated that she believed there was approximately $30,000 in cash in the master bedroom, adding that she would store large sums of cash inside shoes. She admitted that she knew Nelson obtained the money through illegal narcotic sales he conducted at the residence.

    On or about August 31, 2016, a federal grand jury returned an Indictment [Doc. No. 10] against Nelson, finding that he "knowingly and intentionally conspire[d] and agree[d] with others to distribute and to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers," contrary to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), and in violation of Title

8

21, United States Code, Section 846.  Thereafter, Nelson was arraigned on September 8, 2016 on this charge.  Trial in this matter is set to commence on January 9, 2017.

### III. DISCUSSION

Defendant now seeks to suppress his statements made to the Inspectors, and other law enforcement officials, on May 10, 2016 following the execution of the search warrant of his residence on the alleged basis that his "mental condition interfered with his making a voluntary statement." (Def.'s Br. [Doc. No. 25], 3.)

In responding to Defendant's motion to suppress, the Government bears the burden of demonstrating (1) that Defendant, who was subjected to custodial interrogation, waived his rights under Miranda v. Arizona, 384 U.S. 436, 444, 479 (1966), after being given the required Miranda warnings; and (2) that Defendant's statement was voluntary.  Here, Defendant specifically challenges the voluntary nature of his statements.

When determining if a statement made voluntarily, the Court is required to consider "the totality of the circumstances" and determine "whether the defendant's will was overborne." United States v. Walton, 10 F.3d 1024, 1028 (3d Cir. 1993) (citing

9

Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246, 113 L.Ed.2d 302 (1991).  The "ultimate question" is whether or not "the [statement] [was] the product of an essentially free and unconstrained choice."  Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973). Accordingly, a statement must be considered involuntary if the defendant's "capacity for self-determination [was] critically impaired" at the time it was made. Id. at 225-26.

As explained by the Third Circuit, a defendant who seeks an evidentiary hearing on a suppression motion must "(1) state a colorable legal claim, (2) identify facts material to that claim, (3) show why the facts are disputed, and then (4) request a hearing to resolve the dispute."  United States v. Hines, 628 F.3d 101, 106 (3rd Cir. 2010).  To constitute a "colorable" legal claim, "a defendant's motion must consist of more than mere bald-faced allegations of misconduct."  United States v. Voigt, 89 F.3d 1050, 1067 (3rd Cir. 1996).

The Defendant did not initially reveal the reason he believed he had been the victim of mental coercion.  After directing his counsel to make a proffer in open court, and hearing the Government's denial of the allegations, the Court held an evidentiary hearing to resolve the factual dispute.  The

10

Government presented one witness – Inspector Zavorski.  The Defendant testified on his own behalf.

## V. ANALYSIS

Nelson's claim, raised for the first time at the suppression hearing in this matter and not disclosed in the motion requesting a hearing, is that the lead case agent, Inspector Zavorski, told him, in essence, that if he did not confess that the gun and drugs found in the back yard were his that the officers would arrest him, and his wife, and call state child protection officials to take custody of any minor who might have lived in the house.

The Court concludes that the Government has met its burden to show by a preponderance of the evidence that the alleged conversation did not occur.  First, the Court observed the demeanor and heard the testimony of the two witnesses, and based on that observation, finds the Inspector's denial that such a statement was made to be more credible.  Second, the Defendant's testimony that he was verbally threatened is self-serving and uncorroborated.  Third, the Defendant's credibility is suspect as he has four prior felony convictions for drug distribution.

Lastly, considering all of the objective facts and the totality of the circumstances the Defendant's version of the alleged conversation is no more plausible and, in fact is even less plausible, than the Government's version of events. The uncontroverted facts are: a) that a multi-agency group of law enforcement officers, including local police officers had just placed both the Defendant and his wife in handcuffs, b) after having found both the Defendant and his wife of sixteen years in close physical proximity to a weapon and a variety of dangerous drugs, c) concealed next to a home the Defendant shared with his wife that contained other evidence of drug dealing, d) the same home where a large amount of methamphetamine had just been delivered by mail and accepted by the Defendant's wife's adult son, and e) the same home where one or more minor children may have lived.

Taking these facts in roughly reverse order, they do not support the Defendant's version of the conversation but are consistent with the Government's version of the events – i.e., that Defendant's will was not overborne but rather that the Defendant made a voluntary, conscious, and rational decision, after weighing the same known facts and the accompanying risks,

12

to take responsibility for his actions hoping it would spare his family from any additional harm arising from it.

First, it is unclear how the Inspector could have made any meaningful threat regarding the custody of any children even if he had been so inclined. Although a picture from the search warrant was introduced showing what is apparently a room occupied by children, there is no evidence in the record before this Court establishing whether children lived there or whether they were just occasional visitors, whose children they might be, their ages, etc.

The Inspector, moreover, testified he had no knowledge of any minor children residing at the residence, which was not controverted, and none were observed or present during the at least nine hours of law enforcement activity at the Blanche Street location late into a Friday night. It is difficult to understand how such a threat could be made without some understanding of the basic facts about any children that might have lived there.

Second, a reasonable person in Defendant's position would have reason to question whether the Inspector would have the ability and authority to make the promises he allegedly made. At the time the Defendant made the statements he made he knew that

13

a group of local, county and federal officers had spent hours combing the house and yard of a home he occupied with his wife and her adult son.  Those officers had found a handgun, a substantial amount of various dangerous drugs, a large amount of cash, and several tools of a sophisticated high volume drug operation (e.g., a scale, and package sealers).  The gun had been found near where the defendant was standing in the backyard and the money and drug paraphernalia in the house he shared with his wife, including their bedroom.  Nelson himself had 154 Percocet pills on his person.  And he knew his wife had been detained.

Under such circumstances, it is unclear why the Defendant would believe that the Inspector could prohibit or prevent county or local officers from discharging their sworn duty to call the appropriate family services agency if they had reason to believe minor children had been living in such dangerous conditions with an apparently armed drug dealer, or two or three.

As for his wife, the Government established on cross-examination that the Defendant has an extensive history in the criminal justice system and is knowledgeable about how cases are charged and resolved.  Someone with his experience would know that a prosecutor, and not the arresting agent, would make the

14

ultimate decision about whether his wife would be charged. While he no doubt feared what might happen to her, the risk appears to have been derived more from the drug storage and drug dealing occurring in and around the house in which she lived rather than any credible threat or promise from the Inspector.

What seems more likely is what the Government suggested in its cross-examination. That is, that the Defendant made a conscious decision to try and make the best of bad situation by taking responsibility for his own conduct and hoping that law enforcement would take his admissions into account when deciding whether to charge his wife and her son.

Certainly, someone was going to be charged and Nelson was the one found closest to the secreted and largest cache of drugs and a gun. He had over one hundred illegal pills on his person. Having been essentially caught red-handed, his decision to confess seems more like a rational, informed, voluntary, and self-determined statement by someone experienced in the criminal justice system than it does the product of any mental coercion.

### V. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is denied. The Government's cross-motion for reciprocal discovery, which has been previously ordered in the Court's

15

standard order of discovery and inspection is granted.  An Order consistent with this Opinion will be entered.


Dated: December 28, 2016        s/ Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.

16